IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOROTHY WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 8980 |
| | ) | |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| PALMER HOUSE HILTON, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff has brought the current action under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq.*, alleging racial harassment and discrimination, constructive discharge

and retaliation. Defendant has moved for summary judgment on plaintiff's amended complaint.

For the reasons stated in this memorandum and order, defendant's motion is granted.

## I.  BACKGROUND

A.  Local Rule 56

Under Local Rule 56.1, the party moving for summary judgment must submit a statement

of material facts, written in short numbered paragraphs with citations to admissible evidence.

Loc. R. 56.1(a); *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003).  The opposing party must

respond to each paragraph by either admitting or denying the allegations, and specifically citing

to supporting materials showing the existence of a genuine factual dispute.  Loc. R.

56.1(b)(3)(A).  In her response to defendant's Rule 56.1(a)(3) statement, plaintiff denies certain

1

factual statements without citing to the record. Failure to comply with the local rules governing the form of summary judgment motions is not a "harmless technicality." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994). When a party does not properly contest the opposing party's statement of facts, these facts are considered by the court to have been admitted to the extent that they are supported by the record. Rule 56.1(b)(3); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995); *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993). With this caveat, the following facts are undisputed unless otherwise noted.

B.    Facts

Defendant Hilton Hotels Corporation d/b/a Palmer House Hilton is a Delaware corporation that owns and operates the Palmer House Hilton (the "Hotel"), which is located in Chicago, Illinois. Windsor's Lounge and Cigar Bar ("Windsor's") is a lounge and bar contained within the Hotel. The Hotel employed Plaintiff Dorothy Wilson ("Wilson") from February 1, 1999, until May 29, 2003, in the position of beverage server at Windsor's. Wilson was on a medical leave of absence for mental health reasons from May 28, 2002, through the end of her employment. Wilson is an African-American female.

On July 9, 2002, Wilson completed a Charge Questionnaire with the Equal Employment Opportunity Commission (the "EEOC"), in which she alleged the basis for her charge was harassment and unequal terms and conditions of employment based upon race. On July 10, 2002, Wilson filed a charge of discrimination with the EEOC against the Hotel alleging race and sex discrimination. On September 19, 2002, the EEOC issued Wilson a notice of right to sue. On September 5, 2003, Wilson filed an Amended Complaint alleging the Hotel discriminated against her and harassed her on the basis of her sex, race, and ethnicity, constructively discharged

2

her, and retaliated against her.

**Wilson's Employment at the Palmer House**

On February 1, 1999, the Hotel hired Wilson as a beverage server in Windsor's Lounge and Cigar Bar. Wilson's duties included greeting guests, serving guests and replenishing beverages as requested, and checking and maintaining proper set-up and cleanliness of service station before, during and after her shift. Wilson was expected to regularly attend work in conformance with standards that the Hotel set from time to time and was notified that irregular attendance would subject her to disciplinary action.

Windsor's Supervisor Amelia Smith, an African-American female, supervised Wilson from the beginning of Wilson's employment until Smith left the Hotel on or about December 13, 2000. After an organizational restructuring after Smith's departure, Windsor's transitioned from being overseen by one supervisor to being managed by the restaurant manager, Frank Fiacchino, and two assistant managers. During the transition, Mike Schieber, who is white and an assistant beverage manager, assisted in supervising the Windsor's staff from approximately October 2, 2000 until August 14, 2001. Fiacchino began supervising the Windsor's staff when he was promoted from the French Quarter Manager to the Restaurant and Lounge Manager on April 2, 2001.

Fiacchino was assisted by two Assistant Restaurant and Lounge Managers. During Fiacchino's tenure as Restaurant and Lounge Manager, his assistants included David Dudkowski, and, for purposes of the time period at issue here, Stephanie Gaston. The Hotel hired Stephanie Gaston, a white female and French national, as the Assistant Restaurant and Lounge Manager on November 14, 2001.

3

As Assistant Manager, Gaston was responsible for supervising Windsor's and French Quarter staff. This responsibility included scheduling, running the floors, handling any staff and customer problems, disciplining, participating in the hiring process, making sure all of the staff were performing their duties correctly, and ensuring guest satisfaction. On September 13, 2002, Gaston left the Hotel to pursue a career opportunity at the Park Hyatt Chicago.

**Allegations of Discrimination**

Wilson claims that the alleged harassment and discrimination began in January 2002. During much of the time that Wilson worked at Windsor's, she was the only African-American beverage server.[1] Wilson testified that she complained to other employees about being "harassed" and "discriminated against." According to one of Wilson's coworkers, Julia Trilla-Mejia,[2] Gaston "singled out" Wilson for particularly harsh treatment and spoke to her in an abusive tone. Ms. Trilla-Mejia also testified that Gaston yelled at Trilla-Mejia at times, as well as the other servers, and was generally unprofessional.

**Wilson's Sexual Harassment and Sex Discrimination Allegations**

Wilson claims that co-worker Benjamin Wilson called her a "bitch" outside the presence of managers when he became frustrated with her relationship with a coworker, Eva Fis. Wilson failed to complain to anyone concerning Benjamin's alleged comment. Wilson testified that her

---

[1]The record indicates that another African-American woman worked at Windsor's for a short time and left employment there on January 3, 2002. Gaston Dep. at 101, 109. Another African-American woman began at Windsor's after Wilson left. Gaston Dep. at 109.

[2]Defendants object to Ms. Trilla-Mejia's testimony on the grounds that it is "inadmissible opinion," "argumentative," and "conclusory." These objections are not well-taken and are denied. As to the defendant's objection that the testimony is not supported by the portion of the record cited, the court will make the appropriate determination as necessary and only include facts properly supported by the record.

May 11, 2002, conversation with Gaston regarding Gaston's alleged dislike for black women, described below, is also her only evidence of sex discrimination against Gaston that she could "think of."

**Wilson's Racial Harassment and Discrimination Allegations**

Wilson testified that the following comments made by Gaston evidenced racial harassment and discrimination:

- 'Are you deaf? I told you to change the ashtray,'" Wilson admitted, however, that Gaston did not say anything about her race or sex in the conversation in which the comment occurred.

- On another occasion, Gaston was standing against a wall and Wilson was serving customers when Gaston said to Wilson, "'Maybe I don't like you.'"

Further, Gaston *demanded* that Wilson stay at work on the evening of April 13, 2002 instead of *asking* her to stay. Wilson, however, admits that Gaston only ordered her to stay on one occasion and she does not know if this was based on her membership in a protected class. Gaston demanded Wilson finish her work during an overtime shift on April 13, 2002 instead of asking her to complete it. Wilson stated in a grievance that "[i]t would not have been [her] work had [she] not been in overtime and in stead[sic] of saying thanks the next day I get a write up." Wilson admits she does not know what evidence she has that Gaston's demands were discriminatory.

Gaston also ordered Julia Trilla-Mejia, who is white, as well as other beverage servers to complete their duties instead of asking them to do so. Wilson also claims she should have had higher seniority than two other beverage servers, Marcellin and Fis, both of whom are white

5

females. Wilson admits, however, that Marcellin and Fis' alleged erroneous seniority wrongly placed them above white beverage servers as well.

On April 14, 2002, Fiacchino and Gaston issued Wilson a written warning for (1) leaving her station and (2) not completing her shift duties, including failure to clean her tables. Wilson admits that she left her station to go to the gift shop to "wave hello" to a friend working there. When Wilson left to visit the gift shop, a guest approached Gaston to ask for his server. Prior to the written warning, Gaston told Wilson that she needed to be more careful in cleaning her tables after Gaston noticed that she did not do it on one occasion. Gaston had informally counseled Wilson on this incident because she felt that Wilson deserved a chance to improve before implementing formal discipline.

Wilson summarized her feelings of being harassed and discriminated against in the following testimony:

> When I was working, when it was very busy, [Gaston] used to walk around, practically follow me around the tables and just in front of the customers just 'Why isn't this table clean? Why haven't you picked - clean the ashtray up?' I'm trying to work and explain to her, 'I can't get to all these tables. It's very busy. Can you help me?' But she was just belittling me in front of the customers. I'm trying to keep my composure. She was, to me, making the customers feel like I was incompetent, making me feel like I was incompetent. That was interfering with my performance and my tips. She was harassing me.

On or about May 10, 2002, Wilson filed a formal grievance claiming harassment and discrimination on the part of Gaston and Fiacchino. On May 11, 2002, the day after Wilson filed her grievance, Wilson claims she was again harassed and demeaned by Gaston. A hotel guest, Dr. Rane Arroyo, from Ohio filled out the following customer comment card with respect to an incident between Gaston and Wilson:

6

> I heard what looked like a manager belittling her staff in the middle of the lounge, moved them back and forth. I asked my servers (who both helped me) - Julia and Dorothy - if there was something wrong but they were professional and said little. As a hirer, trainer and colleague I'm a little puzzled by the public spectacle of the belittling and also by the melodramatic manner by which honest and attentive workers - at least the two I met were infantilized before their clients, even if just one (but others were also witnesses).

Dr. Arroyo testified that, during his forty-five minute stay at Windsor's, the individual that his servers identified as the manager (i.e., Gaston) talked rudely and loudly to both his servers, whom he identified as Julia Trilla-Mejia and Dorothy Wilson. Dr. Arroyo testified that the "manager" treated both Julia and Dorothy in an unprofessional manner.

Wilson also testified that she sent general manager Gary Seibert a letter enclosing the May 11, 2002, customer comment card. According to Wilson, she and her co-worker, Trilla-Mejia, gave the letter to the reception clerk at the hotel's front desk. Wilson does not know if Seibert received the letter and never spoke to him directly about her concerns even though he came into Windsor's a short time after she alleges she sent him the customer card. Wilson feels that Siebert retaliated against her by not responding to her complaint.

In regards to the May 11, 2002, customer complaint, Fiacchino testified that he tried to contact the customer but was unsuccessful. The customer testified that to his knowledge no attempts were made to contact him. Fiacchino also had a conversation with Gaston regarding the allegations, which Gaston denied.

Also, on or about that same day, May 11, 2002, Gaston spoke with Wilson in the Windsor's kitchen to discuss her job duties. Wilson accused Gaston of not liking her because Gaston, a white woman, is married to a black man and, therefore, does not like Wilson, a black woman. Wilson claims the following conversation evidences Gaston's dislike for her because

7

she is a black woman:

> [Gaston] said 'Maybe, I don't like you.' I said, 'Maybe you don't like black women.'
> [Gaston] said, 'I married a black man.' I said, 'Do I look like a black man to you?'
> And [Gaston] said - I don't know the exact words. She said, 'Maybe you're right.'
> She agreed, 'Maybe you're right.

Wilson claims this was the first time she believes that she was discriminated against on the basis of her race. After her May 11 conversation with Gaston, Wilson attributed previous incidents that occurred to be based on her race as well. Wilson claims David Dudowski, the other assistant manager, asked Wilson to tell customers, all of whom were black, to watch their purses, following a recent theft at Windsor's. Wilson also felt that customers were clutching their purses when she walked up to their tables. She admitted, however, that it was possible that she was perceiving something as discriminatory when there was really nothing discriminatory about it.

Some time between February and May 2002, the Hotel concluded that Wilson had been absent an unacceptable number of days in February. Accordingly, Fiacchino told Wilson in May (Wilson contends it was after the May 11, 2002 incident with the customer, but Fiacchino's testimony indicates it was an unspecified time in "May") that she was going to be disciplined. The Hotel subsequently determined that the absences were not in violation of the Hotel's new attendance policy and Fiacchino discarded the discipline notice.

On or about May 18, 2002, Wilson called Fiacchino and told him that she would be unable to work that day. Wilson testified that Fiacchino went "ballistic" and told her that she could not take the day off because it was extremely busy. On that same day, Wilson told Fiacchino that she was taking a leave of absence because the job was too stressful for her and she was concerned about her son who had been hospitalized since February 2002. She further

8

indicated she was considering not coming back to Windsor's.

On May 23, 2002, Fiacchino issued Wilson a written warning for three absences in May 2002 (May 4, May 5, and May 18).

### Wilson Reports Some of The Alleged Harassment

Wilson did not complain in 2002 to her manager, Frank Fiacchino, that Gaston was harassing her because she is black or female. Wilson alleges she told Fiacchino that "Stephanie is harassing [her]," but admits that she failed to elaborate on what basis, how, or when she complained. Wilson testified that Fiacchini did not seem to care. At one point, several white waitresses (Trilla-Mejia, Marcellin, and Fis) and Wilson all complained to Fiacchino about Gaston's management style. Fiacchino investigated their complaints by observing Gaston's treatment of the staff that complained and meeting with Gaston to discuss her treatment of all the waitresses. Fiacchino discussed with Gaston the staff's impression of her.

Around May 11, 2002, Wilson told Jacque D'Rovencourt, director of food and beverage, that she was "having problems" with Gaston and that she was harassing her, but failed to indicate the nature of these problems or the harassment. She never told D'Rovencourt that she felt she was being discriminated against on the basis of her race or sex. D'Rovencourt allegedly asked Wilson if she wanted to have a meeting, and Wilson said "yes," but the meeting never occurred prior to Wilson's departure on May 28, 2002.

The Hotel investigated Wilson's race and sex discrimination and harassment claims alleged in her May 10, 2002 grievance upon receiving the grievance from the union representative. As part of the investigation, Wilson met with Ken Maier, director of human resources. Maier testified that Wilson was very distraught and that Wilson stated she wanted to

9

go on a medical leave of absence to receive psychiatric care. Maier stated that he told Wilson the procedures to follow to file for a leave of absence, including obtaining a letter from a doctor. Maier testified that Wilson did not want to discuss the basis for the grievance, and that Wilson said she did not want to work at Windsor's anymore.

On May 28, Wilson began seeing Dr. Michael Reinstein for psychiatric treatment. That same day, she gave Maier the doctor's note that he requested from Dr. Reinstein, which indicated that Wilson could not return to work until June 4, 2002, and that she was suffering a mood disorder.

Wilson testified that when she gave Maier the doctor's statement on May 28, 2002, he said "you can't come back to Windsor's." According to Wilson, Maier became angry and forced her to sign a statement that she did not wish to return to Windsor's. Wilson wrote a note in the presence of Maier that states: "I Dorothy Wilson am writing this letter to let management know that due to my circumstances I wish to transfer from Windsor's Cigar Bar. I do not want to return to Windsor." According to Maier, he asked Wilson to write a note to confirm that she was not returning so that he could fill her position on a permanent basis. On May 28, 2002, Wilson's medical leave of absence began.

As part of his investigation, Maier also interviewed D' Rovencourt, Fiacchino and Gaston within the next week or two of receiving the grievance and reviewed their files. Fiacchino informed Maier that he did not feel that Gaston had discriminated against Wilson. Fiacchino also informed Maier that the whole staff thought Gaston was harsh and that he had discussed it with Gaston. Maier discovered employees other than Wilson who had problems with Gaston's management style. Maier discussed Gaston's management style with Fiacchino and

10

D'Rovencourt and the fact that it needed to be refined. Maier characterized Gaston's weakness as not having enough diplomacy. Maier was unable to complete the investigation because Wilson did not return to work.

**Alleged Retaliation**

Wilson claims she was retaliated against when "all of them [allegedly] discussed the matter" referring to Fiacchino, Gaston, Seibert (general manager) and Maier. Wilson believes this is discriminatory "because they were all white and [she] was a black female complaining about being harassed and discriminated against, and being a black female that was a factor." When questioned about Seibert, Maier, Fiacchino, and Gaston allegedly discussing the matter and how Wilson knows that they had a discussion, Wilson testified:

> How could they not know anything after I contacted every single one of these people, and they - all of them are white. I'm a black female. That's saying I'm being - hello, I'm being harassed and discriminated against. Does anybody care? That would make me feel that guess what, they are white, too, just like the lady that discriminated against you, so apparently you're being discriminated against because you're a black female.

When asked if it was Wilson's understanding that she could return to the Hotel after her leave but that she wanted a transfer from Windsor's, Wilson testified, "I was confused - I didn't understand anything." When asked if she wanted to return to Windsor's as of May 28, 2002, Wilson testified, "I didn't know what - I was confused. I - I had a lot of emotions going on at that time. I didn't know what was going on." (Pl. Dep. 161, Tab B). When asked if she was forced to quit, Wilson testified "I don't know what happened with me. I don't know. I didn't know - I don't know what happened with me. I was confused totally." Maier testified that Wilson expressed a strong desire not to work at Windsor's anymore.

**Wilson's Medical History**

On August 1, 1996, Wilson was diagnosed with depression by her treating physician and had been taking Prozac at least four years prior to March 2002. In February 2002, Wilson's son suffered a severe car accident that resulted in his hospitalization for several months and caused Wilson to work "full of depression." In March 2002, Wilson began experiencing paranoia and started to feel like she needed psychiatric care. In 2002, Wilson's mental state was affecting her ability to perform her job. In fact, Wilson admits that she was distracted from work. According to Wilson, the defendant's conduct contributed to her mental state.

Wilson received psychiatric care from about May 2002 until October 2002. Specifically, on June 4, 2002, Dr. Reinstein recommended another week off until June 11, 2002. On June 11, 2002, Wilson completed a Hotel disability form. The form indicates that Wilson was diagnosed with "bipolar mixed - sever [sic] with psychosis." Wilson wrote on the form that she was suffering from a mood disorder. On June 14, 2002, another physician, Dr. Sonnenberg, performed a psychological evaluation on Wilson and diagnosed Wilson as Bipolar Type II with a history of premenstrual phase depression. Dr. Sonnenberg recommended that Wilson not return to work at that time and seek counseling. Dr. Sonnenberg concluded that Wilson's clinical presentation prevented her from working as of June 14, 2002.

On June 18, 2002, Dr. Reinstein recommended an additional week off until July 2, 2002 and Wilson provided the statement to the Hotel. On July 2, 2002, Dr. Reinstein completed another note indicating that Wilson was unable to return to work and would be reevaluated. Dr. Reinstein next treated Wilson on September 3, 2002. At that time, he provided Wilson with a letter diagnosing her condition as "Bipolar Mixed With Severe Psychosis. She is being treated

12

with medication. Her condition is stable at the present time and she is capable of working without restrictions as long as she continues to receive treatment." Wilson testified that she provided this letter to the Illinois Department of Employment Security ("IDES").

Wilson believes that until September 2002, she was under a doctor's order not to work. Wilson stopped receiving psychiatric care as of October 1, 2002 because she "was going to school and...started feeling better, more productive." Wilson was hospitalized in January 2003 for intestinal problems and underwent intestinal surgery related to those problems, which has prohibited her from seeking employment.

### The Hotel Terminates Wilson After She Fails To Return To Work

On June 18, 2002, Maria Rosario, assistant director of human resources, mailed Wilson a letter informing her that she had been placed under a regular leave of absence effective May 28, 2002. The letter stated that Wilson needed to complete and return an enclosed certificate of health care provider in order to qualify for FMLA leave, and provided her information concerning the requirements for obtaining an extension of leave under Hotel policy. She was also advised the Hotel needed a statement from her doctor releasing her back to work.

Wilson denies that she received the letter. Wilson cannot remember when she ceased using her address at P.O. Box 498532, Chicago, Illinois. In fact, Wilson admitted that she has had so many addresses that she does not know exactly when one ended and another one started.

Wilson moved to Colorado in September 2003. Wilson testified that she may have provided the Hotel with a new address sometime at the end of 2002, or early 2003, but she is not sure because she moved around a lot. She cannot remember if she contacted the Hotel after she left Dr. Reinstein's care in October 2002. Wilson claims that she informed the Hotel about her

13

ability to return to work through unemployment - that she assumed that the Hotel obtained the information from the Illinois Department of Employment Security ("IDES").

Other than the information she provided to IDES, Wilson never informed the Hotel that she was able to return to work. Pursuant to the collective bargaining agreement, Wilson was terminated effective May 29, 2003 for failure to return to work within one year of her leave.

**Hotel Policies and Procedures**

The Hotel sets forth its rules, policies and procedures in its Employee Handbook. Wilson acknowledged in writing that she received the Handbook on February 1, 1999 and again on May 30, 2001. The Hotel required Wilson to follow the Handbook during her employment.

From 2000 until the Spring 2002, Windsor's employees were subject to Windsor's Absence/Tardy Policy. Wilson acknowledged in writing that she received Windsor's Absence/Tardy Policy and that she was required to follow it. The Windsor's Absence/Tardy Policy provided that "[t]he department will define any team member as excessively late if any combination of lateness and absence exceeds two tardies in one month or two absents in 90 days." In Spring 2002, the Hotel implemented a uniform Absence/Tardy policy that applied to all Hotel departments, which superceded Windsor's Absence/Tardy Policy.

The Spring 2002 Absence/Tardy policy provides that "[a]ll staff members must call at least two (2) hours prior to their scheduled start time to report an absence or tardy…The staff member must personally call off to a manager of their representative." The Spring 2002 Absence/Tardy policy mandates that "[d]isciplinary action should be taken if any combination of absence/tardy exceeds two in a sixty-day period." The Spring 2002 Absence/Tardy policy further provides that employees are subject to a written warning or the next step of discipline beyond a

14

written warning for no call - no show. Wilson understood a no call- no show to result in a "write up."

In addition, the Handbook, revised May 2001, provides the following discipline for a no call - no show: First incident--Written Warning; Second incident--Three day suspension without pay; Third incident--Termination. The Hotel has disciplined at least eleven Windsor's employees, including non-African Americans and males, for attendance violations. None of these employees complained of harassment or discrimination during their employment with the Hotel.

The Hotel's "Standards of Conduct" sets forth a non-exhaustive list of unacceptable conduct for employees, including, but not limited to failure to report to work as scheduled, including overtime, working unauthorized overtime, or refusal to work a reasonable amount of overtime when required, and leaving assigned work area without permission.

Although the Hotel "reserves the right to determine what type of disciplinary action, including warning, suspension, or termination, may result from any violation of the standards of conduct," it maintains a progressive discipline process that consists of verbal warning, written warning, suspension, and then termination, depending on the infraction and prior discipline. Managers typically review an employee's file for previous discipline to determine the level of discipline to implement. Prior discipline usually subjects an employee to the next level of discipline if the prior discipline occurred within the previous year.

The Hotel's human resources department usually reviews discipline warranting a written warning or higher. Prior to providing the disciplinary action form to human resources for review, however, the manager typically completes the written discipline and discusses it with the

15

employee.

The Hotel has disciplined at least ten Windsor's employees for work rule violations. None of these employees complained about harassment or discrimination during their employment with the Hotel.

### Hotel Discrimination/Harassment/Retaliation Policies and Training

The Handbook contains an Equal Employment Opportunity ("EEO") Policy that prohibits discrimination based on race or sex. The EEO Policy also prohibits retaliation for reporting suspected violations of the policy. The Handbook also contains an additional Harassment-Free Workplace Policy that prohibits harassment based on race or sex, and it prohibits retaliation for reporting suspected violations of the policy.

The Hotel's EEO Policy and Harassment-Free Workplace Policy encourage employees to report violations to the director of human resources, their supervisors, or any department head. The Handbook also contains an "Open Door Policy." The goal of the Open Door Policy is to ensure its team members feel comfortable about raising questions and "provide an effective means for team members to bring their concerns to the attention of people who want to help." It further provides that "[a]ny discrimination or recrimination against a team member for presenting an issue, problem or complaint is prohibited."

All Hotel employees attend mandatory one-day training sessions upon hire. The sessions include training on all Handbook provisions, including the EEO, Harassment-Free Workplace, Open Door, and Diversity policies. The Hotel posts the Department of Labor Five in One poster at its time clocks as well.

As a beverage server at Windsor's, Wilson was a member of H.E.R.E. Local 1, and the

16

terms and conditions of her employment were covered by the Union's collective bargaining agreement with the Hotel. Wilson received a copy of the applicable collective bargaining agreement. The collective bargaining agreement contains a non-discrimination clause that prohibits discrimination based upon race and sex with respect to the terms and conditions of employment.

Section 11 of the collective bargaining agreement provides that "[i]n the event an employee medically able to return to work desires to extend the leave of absence, the employee shall notify the Employer and apply for a personal leave of absence in accordance with the requirements of this section for personal leaves of absence." Section 11 further provides that "[n]o leave of absence, whether medical or personal, may exceed the employee's length of service with the Employer or one (1) year, whichever period is shorter."

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This court must evaluate the evidence supporting the summary judgment motion in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. ANALYSIS

### A. Hostile Work Environment

17

To survive summary judgment on hostile work environment claim under Title VII, an employee must show: (1) she was subject to unwelcome harassment; (2) harassment was based on her race or sex; (3) harassment was severe or pervasive so as to alter conditions of employee's work environment by creating hostile or abusive situation; and (4) there is basis for employer liability. *Smith v. Northeastern Illinois University*, **388** F.3d 559, 566 (7th Cir. 2004) (citations omitted). For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Title VII is not directed against unpleasantness *per se* but rather against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir.1998) (quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir.1994)).

Wilson contends that she was "singled out" by Gaston for especially harsh treatment to which other non-African American employees were not subjected. Specifically, Wilson states that Gaston spoke to her in an abusive manner, belittled her in front of other customers, interfered with Wilson's ability to work, and when confronted, Gaston agreed that "maybe" she did not like black women.

According to Wilson, Gaston created a hostile work environment because Gaston asked her if she was deaf when Gaston told Wilson to change ashtrays, Gaston told Wilson "maybe I don't like you," Gaston demanded that Wilson stay at work one night in April 2002 instead of asking her, and Gaston demanded that Wilson finish her work during an overtime shift instead of asking her to complete it. Wilson also testified that Gaston would follow Wilson around her

18

tables and critique her work, asking, "Why isn't this table clean" and "Why haven't you picked –

clean[ed] the ashtray up?" Wilson testified that Gaston made her feel incompetent, harassed her

and interfered with her tips. Wilson also directs the court's attention to an incident reported to

Dr. Rane Arroyo's comment card noting that a manager was belittling her staff. Dr. Arroyo

testified that the "manager" treated both Julia Trilla-Meija, one of Wilson's co-workers, and

Wilson in a rude manner, and was speaking loudly and unprofessionally to Wilson.

Further, Trilla-Meija, testified that Gaston treated Wilson more harshly than the other

servers. In addition, as noted above, Wilson testified to the following conversation with Gaston:

> Gaston: "Maybe I don't like you."
> Wilson: "Maybe you don't like black women"
> Gaston: "I married a black man."
> Wilson: " Do I look like a black man to you?"
> Gaston: "Maybe you're right."

As to the sexual harassment claim, Wilson claims that a male coworker, Benjamin

Wilson, called her a "bitch" outside the presence of managers.

As noted by defendants, the above facts simply demonstrate that Wilson was treated in a

rude and unprofessional manner. Most of the above incidents give no indication whatsoever that

Wilson was treated poorly based on her race or sex. Indeed, the evidence shows that Gaston

treated all of the servers poorly. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir.

2004) (plaintiff could not establish that she was harassed because of her gender because evidence

showed that two of the shift superintendents about whom plaintiff complained were vulgar to

everyone and treated all workers poorly) (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d

340, 346 (7th Cir.1999)).

As to the conversation in which Gaston said "Maybe you're right" in response to the

accusation that she did not like black women, "'offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Dandy v. United Parcel Service*, 388 F.3d 263, 271 (7th Cir. 2004) (citations omitted). *See also Patton v. Ind. Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (claims that supervisor was rude, abrupt and arrogant, ignored employee's suggestions, and failed to inform employee about changes at work did not establish hostile work environment); *see also Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor ... fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.") The court cannot conclude that a reasonable person would find this one statement to be serious enough to create a hostile work environment. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004).

Wilson's citation to *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993), is not persuasive. In *Rodgers*, the court affirmed the district court's finding that a racially hostile environment existed based on the fact that supervisor had called plaintiff a "nigger" at least twice to his face, another employee testified that the supervisor had used the term "nigger" between five and ten times, and the supervisor said that "[y]ou black guys are too [expletive deleted] dumb to be insurance agents" and "[y]ou must think you're back in Arkansas chasing jack rabbits." *Id.* In the instant case, however, Gaston's "maybe you're right" comment simply does not rise to the level of the seriousness of the comments in *Rodgers*. *Cf. id.* ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.") (citations omitted).

20

For the same reason, the court concludes that another coworker calling Wilson a "bitch" in an incident wholly unrelated to Gaston's conduct or comments does not create a hostile work environment.

The court finds that Wilson has failed to state a *prima facie* case for sex or race harassment. As such, the court need not address defendant's argument that it has an affirmative defense to vicarious liability for supervisory harassment.

B.    Discrimination

While it is not entirely clear from Wilson's complaint or the EEOC charge, it appears that Wilson is arguing that Gaston's alleged poor treatment of Wilson as well as Gaston's "selective" discipline of Wilson was discriminatory. Under Title VII it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. An employee alleging discrimination may proceed by presenting direct evidence of discriminatory intent or by using the indirect (i.e., *McDonnell Douglas* burden-shifting) method. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

"To prove discrimination via direct evidence 'essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.'" *Jordan v. City of Gary,* No. 03-3772, 2005 WL 182412, at *4 (7th Cir. Jan. 28, 2005) (citation omitted). Under the indirect method, Wilson must establish a prima facie case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) at least one

21

similarly situated employee, not in her protected class, was treated more favorably. *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 978 (7th Cir. 2004). If the plaintiff proves her *prima facie* case, then "it is incumbent upon the defendants . . . to counter with a legitimate, nondisciminatory and nonpretextual reason for the employment action." *Jordan,* No. 03-3773, at *5. As in any Title VII action, the ultimate burden of persuasion remains on the plaintiff to show that the employer intentionally discriminated against her. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993). Wilson states that she has established a *prima facie* case of discrimination under the indirect method, and, unsurprisingly, the defendant disagrees.

1.    *Indirect Method*

Wilson meets the first prong of the *prima facie* test under the indirect method as she is an African-American woman. As to whether Wilson was meeting the Hotel's legitimate performance expectations, the Hotel contends that she was not meeting these expectations as evidenced by Wilson's disciplinary record over the course of her employment. Specifically, the Hotel points to the fact that Gaston's predecessor, Amelia Smith, issued Wilson a documented verbal warning on November 5, 1999, for failing to serve customers and leaving her section dirty and disorderly.[3] Smith had also previously discussed the issue with Wilson on the same problem prior to the verbal discipline. Smith also disciplined Wilson because Smith had to serve Wilson's customers (who had complained) because Wilson left to use the bathroom and was not available to serve them. Then, on November 11, 2000, assistant beverage manager, Scheiber, issued Wilson a coach and counseling "regarding her continually neglecting her side work." And

---

[3]Wilson refused to sign the warning stating that she "paid [the] bar porter and he got [the] tables mixed up to clean."

on June 12, 2001, Scheiber issued Wilson a coach and counseling for signing out thirty minutes before she punched out.

On April 14, 2002, Fiacchino and Gaston issued Wilson a written warning for two infractions that occurred on April 13, 2002—(1) leaving her station and (2) not completing her shift duties, including failure to clean her tables. As to the first, Wilson admits that she left her station to wave hello to a friend in the gift shop. While Wilson was gone, a customer approached Gaston to ask for his server. Prior to this written warning, Gaston told Wilson that she needed to be more careful in cleaning her tables after Gaston noticed that she did not do it on one occasion.

Wilson admits that she left one of her tables dirty on April 13, 2002. Wilson claims that she paid another employee to clean the table, but that employee informed Gaston that Wilson had not paid him to clean her table. Wilson also admits that on April 13, she left Windsor's at approximately 2:00 am (closing time), when there were still approximately 50 customers in the establishment. According to her deposition testimony, Wilson's shift ended at 12:30, but she stayed until 2:00 a.m. Wilson denies that she left her shift before completing all of her duties, and that she let Gaston know that she was leaving. However, Gaston was not happy when Wilson left at 2:00 a.m. with customers still in the bar. Finally, Wilson was issued a written warning on May 23, 2002 for missing three work days in May 2002.[4]

Wilson responds that her co-workers believed that Wilson was performing her duties in the bar "more than adequately" despite Gaston's harassment and that Gaston testified in her deposition that Wilson "was a good worker, and she was in no danger of being terminated by the

---

[4]Wilson was also disciplined in May 2002 for February 2002 absences, but this discipline form was discarded when the Hotel learned that Wilson's February 2002 absences did not violate the Hotel's new attendance policy.

Hotel." The court notes that Gaston testified that Wilson was a "good worker" but the cited testimony does not state that she was in no danger of being fired.

The Hotel's recitation of Wilson's entire history of disciplinary infractions is not necessarily relevant to the case at hand given that Wilson is complaining only about Gaston's conduct and alleged discriminatory discipline towards the end of Wilson's employment. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) (in determining whether a plaintiff has met her employer's legitimate expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination"). Nevertheless, because Wilson admits that she left her work area to wave hello to a friend, that she did not clean a table and that she was absent for the three days in May for which she was disciplined, the court finds that Wilson was not meeting the Hotel's legitimate expectations in the areas for which she was disciplined.

This conclusion is not changed by Gaston's characterization of Wilson as a "good worker" or Julia Trilla-Mejia's (Wilson's co-worker) belief that Wilson was performing her duties "more than adequately" as this evidence is not enough to establish that Wilson was meeting her employer's legitimate expectations. The Seventh Circuit has held that "the general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated." *Peele*, 288 F.3d at 329 (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir.1994) ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's

own perception of satisfactory job performance.") (other citations omitted). Wilson points to no other evidence that she was meeting the Hotel's legitimate expectations; thus, she has failed to satisfy her burden with respect to this prong of the *prima facie* case.

Even assuming that Wilson was meeting the Hotel's legitimate performance expectations, Wilson has failed to meet the third and fourth prongs of the *prima facie* case. As to the third prong, an adverse employment action, Wilson claims that Gaston's "harassing tone and conduct, following Plaintiff around the tables and constantly critiquing Plaintiff's work, and comment confirming her dislike of black women, is ample evidence of adverse employment action." Wilson also points to the "selective" discipline imposed on her.

"An adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (no adverse employment action when employer changed plaintiff's shift; lengthened her commute; transferred her to a different facility; unfairly disciplined her; substituted a favorable evaluation for a more favorable one; issued her letters of warning; assigned her to difficult cases and gave her additional work that she perceived was outside her normal job responsibilities; refused to approve annual leave requests when work was backlogged; and denied her a parking permit for approximately four days).

Gaston's allegedly harassing tone and conduct, her critiques of Wilson's work and her comment that "maybe she didn't" like black women simply do not rise to the level of those required to constitute an adverse employment action. As noted by the Seventh Circuit, an adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities. *Id.* Wilson has failed to make such a showing with respect to Gaston's

25

conduct toward her. As to the selective discipline, (i.e., April 14, 2002 and May 23, 2002

disciplinary notices), this also does not constitute a sufficient adverse employment action. *Id.*

(alleged unfair discipline not an adverse employment action); *Oest v. Illinois Dep't of*

*Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("Nor do we believe that the oral or written

reprimands received by [plaintiff] under the Department's progressive discipline system can be

considered, on this record, as implicating sufficiently 'tangible job consequences' to constitute an

independent basis of liability under Title VII.").

Moreover, it is clear that Wilson has not satisfied the fourth prong–that at least one

similarly situated employee was treated more favorably. In determining whether employees are

similarly situated, "a court must look at all relevant factors, the number of which depends on the

context of the case." *Radue*, 219 F.3d at 617. Furthermore, "in disciplinary cases--in which a

plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly

situated employee based on some prohibited reason--a plaintiff must show that [she] is similarly

situated with respect to performance, qualifications, and conduct." *Id.* (emphasis added). "This

normally entails a showing that the two employees dealt with the same supervisor, were subject

to the same standards, and had engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." *Id.* at 617- 18 (emphasis added).

Wilson asserts that she was treated worse than other employees at the lounge, but does

not point to any information of evidentiary quality, *i.e.,* depositions, answers to interrogatories,

admissions on file, or affidavits, that supports this argument and fulfills the criteria necessary to

show a similarly situated employee was treated more favorably. *See Celotex Corp.*, 477 U.S. at

26

322. Wilson states in her EEOC charge that "[i]n or about May 2002 I was issued a disciplinary notice for missing work while a white co-worker is constantly late for work and is not disciplined." However, Wilson fails to state who the "white co-worker" is and also fails to state whether this person had the same or similar job, was subject to the same standards, was supervised by Gaston and had comparable, experience, education, and other qualifications. As such, Wilson has not established that one of her co-workers was similarly situated in the first instance, let alone that a similarly-situated employee was treated more favorably than she was treated.

### 2. *Direct Method*

Neither party directly addresses whether discrimination has been demonstrated under the "direct" method, though Wilson asserts in her response brief that "Gaston's behavior toward Wilson, her selective and discriminatory treatment and discipline of Wilson observed by other employees, and her confirmation that she 'maybe' didn't like black women demonstrate *directly* that a discriminatory reason likely motivated the treatment of Ms. Wilson." Pl. Resp. at 16 (emphasis in original). To the extent that Wilson is asserting that she has direct proof of discrimination, the court will address it here.

Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003); *see also Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (noting that direct evidence of discrimination takes the form of "I fired you because of your age or disability"). Thus, the only comment that Wilson points to that constitutes direct evidence is Gaston's response of "maybe you're right" to Wilson's accusation that Gaston did not like black

27

women. But whether she tries to show discrimination under Title VII by the direct or indirect method, Wilson still must show that she suffered a materially adverse employment action. *See, e.g., Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir.2004). As the court noted above, neither the harassing behavior by Gaston nor the two disciplinary write-ups are sufficient to constitute a materially adverse employment action.

Wilson was, however, terminated, and termination is an adverse employment action. Nevertheless, "[c]omments by someone who was not the decision-maker and had no role in the adverse employment action cannot constitute direct evidence of discrimination." *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 n. 4 (7th Cir.1998). The record does not reflect who the decision-maker was in Wilson's alleged constructive termination, only that Maier was the person who allegedly constructively discharged her. Even assuming the decision-maker was Maier, he did not make the alleged discriminatory comment. Further, Wilson has failed to point to any evidence that Gaston was involved in the alleged decision to terminate her. Thus, this aspect of her direct evidence claim fails.

Because Wilson has failed to establish sex and/or race discrimination under either the direct or indirect methods, the court grants defendant's motion for summary judgment as to this aspect of the First Amended Complaint.

C.     Retaliation

Wilson also alleges in her First Amended Complaint that she was retaliated against by defendant. Defendant argues that Wilson cannot bring the retaliation claim because it is outside the scope of her EEOC charge.

In addition to allegations in the administrative charge, Title VII cases can include claims

28

that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976). These permissible related claims specifically include retaliation for the filing of a charge. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989), *superseded on other grounds by statute, Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992). However, as noted by defendants and from what this court can ascertain, the facts supporting her retaliation claim occurred prior to the filing of the EEOC charge. Specifically, in her deposition, when asked which events supported her retaliation claim, Wilson referred to the following: (1) the May 2002 incident when Frank went "ballistic" when she called to inform Fiacchini that she could not come to work; (2) the fact that the Hotel had notified Wilson after she filed her grievance that she was going to be disciplined for absences in February (which discipline was revoked after it was determined that Wilson had not violated the Hotel's attendance policy), and (3) the fact that "nobody tried to help" her.

Because these events all occurred prior to the filing of her EEOC charge, the retaliation claim is outside the scope of the charge. *Fernando v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 882 F. Supp. 119, 123 (N.D. Ill. 1995) (a "retaliatory discharge claim, where the retaliation occurred before the filing of [the] EEOC claim, was outside the scope of the EEOC charge.").

The court notes further that Wilson does not respond to defendant's assertion that it should be granted judgment on the retaliation claim as a matter of law. "Employment discrimination cases are extremely fact-intensive" and the court is not "'obliged to scour the record looking for factual disputes.'" *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (citation omitted). Instead, plaintiff "must present definite, competent

evidence in rebuttal" if she wishes to successfully oppose defendants' motion. *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002). Here, plaintiff has made no effort to rebut defendants' argument as to the retaliation claim or point to any evidence relating to the defendants' argument. Summary judgment is granted in favor of defendant on the retaliation claim.

D.   Constructive Discharge

Wilson claims she was constructively discharged on two grounds: (1) the above-described mistreatment by her supervisor, Gaston; and (2) the fact that Maier, the director of human resources, told her that she could not return to Windsor's. Defendant claims that Wilson cannot establish constructive discharge because she "cannot demonstrate that her working conditions were 'so unbearable that a reasonable person [put in the same condition] would be forced to quit.'" *Williams v. Waste Mngt. of Illinois*, 361 F.3d 1021, 1032 (7th Cir, 2004); *see also Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).

The work environment for a "constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). The court has already concluded that Wilson has not established a hostile work environment as to the conduct by her supervisor, Gaston. Accordingly, Wilson's constructive discharge claim based on Gaston's conduct fails.

Wilson also claims that Maier's comment that she could not return to work also was grounds for her claimed constructive discharge. However, the claim of constructive discharge as it relates to Ken Maier is actually a claim of wrongful termination. Wilson has not alleged that

30

Maier's comment created a working environment that was so unbearable that she had to leave; rather, Wilson is claiming that Maier terminated her outright on May 28, 2002, when he allegedly stated "you can't come back to Windsor's."[5] Indeed, in her First Amended Complaint, the one and only count that she specifically lays out (rather than what the court must piece together from the various allegations in her complaint and the EEOC charge) is for "wrongful termination."

However, this claim fails. First and foremost, the wrongful termination claim is outside the scope of her EEOC charge. Wilson filed her EEOC charge on July 10, 2002; however, the charge fails to make any mention of her alleged termination on May 28, 2002. Nor is the claim "like or reasonably related to" the allegations of harassment such that the wrongful termination claim could be considered part of her EEOC charge. *Jenkins,* 538 F.2d at 167 (party may only bring claims outside of the scope of the EEOC that are like or reasonably related to the allegations in the charge). The allegations in her EEOC charge appear to be based on the conduct of Gaston (i.e., "I was subjected to harassment by my Supervisor in the form of constant threats of discipline and demeaning and embarrassing treatment in front of customers and coworkers. I have also been subjected to demeaning language and called a bitch, on many occasions, by a male co-worker"), and not on alleged discrimination related to her termination. Because the allegation of wrongful termination is outside the scope of her EEOC charge, it must fail.[6]

_____

[5]It is unclear to the court when Wilson officially left the employment of the Hotel. The Hotel contends that she was terminated on May 29, 2003, one year after the beginning of her medical leave. However, in her interrogatory answers and in her deposition, Wilson stated that she received unemployment benefits after she left the employment of the Hotel from September 2002 to July 2003.

[6]Even if the court were to consider the wrongful termination claim a retaliatory discharge claim based on Wilson's allegation in her First Amended Complaint that she was "requir[ed] to forfeit her position at Windsor's Lounge in order to take a medical leave of absence," such a

31

Even if the claim were within the scope of her charge, Wilson has not put forth any direct evidence that the termination was based on discriminatory animus by the Hotel. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus"). Nor has Wilson satisfied a *prima facie* case under the indirect method because she has failed to show that at least one similarly situated employee was treated more favorably. Accordingly, the court finds that defendant is entitled to judgment as a matter of law on plaintiff's claims of constructive discharge and wrongful termination.

E.     Punitive Damages

Because the court concludes that all of Wilson's claims fail as a matter of law, it need not address the parties' arguments as to whether Wilson is entitled to punitive damages.

**F.     CONCLUSION**

For the reasons stated herein, defendant's motion for summary judgment is granted. The clerk is directed to enter judgment against the plaintiff.

**ENTER:**

**DATE:**   April 29, 2005

Blanche M. Manning

**Blanche M. Manning**
**United States District Judge**

_____

claim would also be outside the scope of the EEOC charge. *Fernando,* 882 F. Supp. at 123 (N.D. Ill. 1995) (a "retaliatory discharge claim, where the retaliation occurred before the filing of [the] EEOC claim, was outside the scope of the EEOC charge.").